# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 09-4075

IN THE MATTER OF:

LUIS E. SOLIS, et al.,

*Debtors.*

APPEAL OF:

JOSEPH M. O'CALLAGHAN.

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 3:09-cv-50164—**Philip G. Reinhard**, *Judge.*

ARGUED MAY 28, 2010—DECIDED JULY 9, 2010

Before MANION, WILLIAMS, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* The legal profession has not treated debtor Luis Solis well. The secretary of an attorney who settled Solis' workers' compensation claim stole nearly half of the amount he was owed. Then a second attorney whom Solis had hired to recover the rest of the stolen settlement—appellant Joseph O'Callaghan—asserted an attorney fee claim for a percentage of the entire amount of the settlement, including the portion that Solis had already been paid before he hired that second attorney. The legal issue in this appeal

is whether the second attorney "recovered" money for his client when he established the client's entitlement to the sum of money already in the client's possession. Appellant O'Callaghan insists that the answer is yes. We disagree. Under the terms of the contingent fee agreement in this case, O'Callaghan is entitled to a percentage of only the money he actually recovered from other parties, not a percentage of the money Solis had received earlier. We affirm the judgment of the district court.

This appeal comes to us from a bankruptcy proceeding in which the court resolved O'Callaghan's claim for an attorney fee and costs on cross-motions for summary judgment. The relevant facts are not in dispute. Luis Solis suffered substantial spinal injuries on the job in 2001 and 2002. He hired an attorney to assert a workers' compensation claim. That claim was eventually settled in 2004 for a net payment to Solis of $107,980 after attorney fees and costs. Solis' attorney issued him a check in that amount, but that check was stolen by the attorney's secretary, Maura Mora, and deposited into her personal bank account. In February 2005, after Solis asked about his money, Mora caused a cashier's check to be issued to Solis in the amount of $62,410. She told Solis the cashier's check was a partial payment of the settlement proceeds. Solis never received the remainder of the settlement funds.[1]

---

[1] Mora stole approximately $1.5 million dollars from her employers' clients. She was convicted of 15 counts of theft and is now in a state prison.

After he received the check from Mora, Solis retained a second attorney, appellant O'Callaghan, to recover the rest of the settlement that was owed to him. O'Callaghan took the case on a contingent fee basis. Under the written contingent fee agreement, O'Callaghan would receive 40 percent of "any gross amount recovered in the event of suit being filed." "Gross amount" was defined as "the total amount of money received on [the] case before deduction of any expenses." O'Callaghan filed suit in Illinois circuit court against a number of named and unnamed defendants. In that suit, he requested money damages for the unpaid portion of the settlement and a declaration that Solis was legally entitled to retain the $62,410 he had already received. In 2007, the parties to that state court action settled the case for a new payment of $60,000 in cash to Solis and an agreement by the defendants to relinquish any claims they might have had to the sum of $62,410 already in Solis' possession.

Before the settlement funds were transferred to Solis, however, he filed for Chapter 7 bankruptcy protection. The bankruptcy trustee stepped into Solis' shoes and recovered the promised settlement payment of $60,000 in cash. O'Callaghan then filed a claim against the bankruptcy estate for $49,719.63 in attorney fees and costs. His claim seeks 40 percent not only of the new $60,000 cash that was obtained, but also of the $62,410 that Solis had received before he even contacted O'Callaghan (plus $755.63 in expenses). The bankruptcy trustee objected that O'Callaghan was entitled at most to $24,755.63— equal to 40 percent of the $60,000 cash actually received

under the settlement, plus the same expenses. The parties filed cross-motions for summary judgment.

The bankruptcy court denied O'Callaghan's motion, granted the trustee's motion in part, and allowed O'Callaghan's claim in the amount of $24,755.63. The district court affirmed on appeal, and O'Callaghan has filed this further appeal. We have jurisdiction because the bankruptcy court's decision and the district court's decision were both appealable final decisions that completely resolved O'Callaghan's claim. See, *e.g.*, *Zedan v. Habash*, 529 F.3d 398, 402 (7th Cir. 2008); *In re Golant*, 239 F.3d 931, 934-35 (7th Cir. 2001). We review the bankruptcy court's grant of summary judgment de novo. *In re Midway Airlines, Inc.*, 383 F.3d 663, 668 (7th Cir. 2004).

We first address O'Callaghan's misplaced argument that the trustee lacked standing to challenge his claim because (1) the trustee was not a party to the fee agreement; and (2) the $62,410 on which the disputed portion of the fee was based was not part of the bankruptcy estate. Under O'Callaghan's theory, apparently no one would have standing to object to his claim, which would certainly make it easier for the claim to be approved. But it is irrelevant that the trustee was not personally a party to the fee agreement. A bankruptcy trustee acts as the debtor's representative regarding such claims. See *In re New Era, Inc.*, 135 F.3d 1206, 1209 (7th Cir. 1998) (noting that a trustee has the nearly exclusive right to represent the debtor in court, and that it was "sanctionably clear" that another lawyer had no right to appeal in debtor's name). It is also irrelevant whether the first $62,410

was part of the bankruptcy estate. The $60,000 against which O'Callaghan asserted his claim is of course part of the estate. The trustee had standing to contest O'Callaghan's claim.

O'Callaghan's claim turns on the interpretation of a contract for fees, so we look to Illinois contract law. See *Grogan v. Garner*, 498 U.S. 279, 283-84 & n.9 (1991). In Illinois (as in all states), a court gives contract terms their "common and generally accepted meaning," as informed by the "context of the contract as a whole." *Krilich v. American National Bank & Trust Co. of Chicago*, 778 N.E.2d 1153, 1164 (Ill. App. 2002). Illinois construes attorney contingent fee agreements strictly in favor of clients in order to protect them from unscrupulous attorneys who might manipulate the agreement terms in their favor. See *Guerrant v. Roth*, 777 N.E.2d 499, 504-05 (Ill. App. 2002).[2]

Under his agreement with Solis, O'Callaghan was to receive a percentage of the money "recovered." The bankruptcy court held that O'Callaghan "recovered" only the $60,000 in cash obtained after Solis hired O'Callaghan, and that he at most "clarified title" to the earlier payment of $62,410. The district court agreed: "Construing the fee agreement to include this sum as an amount recovered stretches the terms of the agreement too far.

---

[2] The circumstances of this case are consistent with the concerns raised in *Guerrant*. Solis is a non-native English speaker who may have been unusually susceptible to any manipulation of a fee agreement's language.

The language of the agreement makes no mention of calculating the fee based on losses avoided. Appellant's efforts as to the $62,410 did not result in a recovery but at best a loss avoidance." Judge Reinhard also wrote: "The ordinary meaning of 'recover' is to get something back that is not currently in one's possession. The ordinary meaning of 'recovered' would not encompass retaining something already in one's possession."

We agree with the bankruptcy and district courts. Read in context—as part of a contingent fee agreement—the term "recovered" most naturally encompasses situations in which the client actually receives cash or property from some other parties as a result of the attorney's efforts. That the Illinois courts read contingent fee agreements strictly in favor of the client supports this interpretation. This contingent fee agreement cannot fairly be read as an agreement by Solis to pay O'Callaghan 40 percent of the $62,410 that Solis had already received. Nor can it fairly be read as a promise to pay O'Callaghan 40 percent of that sum for securing Solis' title to the money or for defending him against any claims for that money. The agreement makes no mention of any such claims having been asserted against Solis at the time he and O'Callaghan entered the agreement.

For purposes of this argument, we may assume without deciding that attorney fee agreements for defense of claims or counterclaims could have some contingent element that would depend on the ultimate outcome of the case. We are confident that if such agreements are permissible (for example, in commercial litigation in

which the client is a sophisticated consumer of legal services), they would still require clear and explicit language that the client fully understands. In this case, there was certainly no clear or explicit indication to Solis that he was agreeing to pay O'Callaghan 40 percent of the $62,410 that Solis had already received on his own.[3]

Accordingly, like the bankruptcy court and district court, we read the agreement to entitle O'Callaghan only to his costs and 40 percent of the $60,000 in cash he actually obtained from the defendants on behalf of Solis. See *In re Gerard*, 548 N.E.2d 1051, 1056-57 (Ill. 1989) (inter-

---

[3] The trustee suggests that *In re Doyle*, 581 N.E.2d 669 (Ill. 1991), may be read as prohibiting contingent fees for attorneys defending against monetary claims. The *Doyle* court disapproved of contingent fee agreements where there is no genuine dispute or controversy, as where an attorney merely submitted an uncontested claim on behalf of a client seeking proceeds from a life insurance policy. See 581 N.E.2d at 675, discussing *In re Teichner*, 470 N.E.2d 972 (Ill. 1984). The *Doyle* court made clear that a contingent fee for recovering proceeds of an insurance policy was not reasonable where there would be concern only about the speculative possibility of adverse claims. 581 N.E.2d at 676. We do not read *Doyle*, which dealt with a different sort of problem, as flatly prohibiting contingent fee agreements for defense of monetary claims against the client. To the extent that *Doyle* disapproves of contingent fee agreements based on the defense of speculative future claims, the claims here were not speculative. The trustee admitted for purposes of the bankruptcy proceeding that at least some claims had been asserted by others against Solis seeking the money he had received from Mora.

preting term "recovered" in fee agreement to suggest "reobtaining [property] from somewhere outside of [the client's] sphere of control"). The trustee conceded O'Callaghan's entitlement to this amount, so we have no occasion to examine whether this amount was reasonable.

The cases O'Callaghan cites for a broader definition of "recover" interpreted the Illinois Attorney's Lien Act, which is not subject to the same interpretive rules as a fee arrangement between attorney and client. See, *e.g.*, *Standidge v. Chicago Rys. Co.*, 98 N.E. 963, 966 (Ill. 1912); *Reed Yates Farms, Inc. v. Yates*, 526 N.E.2d 1115, 1121-22 (Ill. App. 1988). Even if these cases were relevant, they are consistent with our analysis. In *Reed Yates Farms*, the court found a "recovery" where the attorney's representation had resulted in cash payments to the client and effectively increased those payments' amount above what they would have been otherwise. *Id.* at 1122. In this case, O'Callaghan's later representation neither caused the earlier payment of $62,410 to Solis nor increased the amount of that payment. In *Standidge*, the Illinois Supreme Court held that a formal judgment or decree was not necessary for a recovery under the Lien Act, noting that the word "recover" in the Act meant "receive," so that a settlement payment would be "recovered" despite the absence of a judgment. 98 N.E. at 966. Standidge had represented his client for a year. The client and opposing party then settled the case by bypassing attorney Standidge, and the client received cash. *Id.* at 964. Read in light of the specific issue addressed and its factual context—money received after and because of an attorney's lengthy representation—*Standidge* cannot be

stretched to cover this entirely different case, in which the client received the money before and independent of the attorney's representation.

O'Callaghan insists that it was necessary and appropriate to establish Solis' right to the $62,410 that he had already received. We assume for purposes of argument that Solis (or at least his creditors) benefitted from the surrender of all possible claims against the $62,410 he had received from Mora. We will even assume for argument's sake that Solis was not a holder in due course of the check and therefore possibly subject to third-party claims against that money. But these assumptions are relevant only to the *reasonableness* of the increased fee claimed—if Solis was never at risk of any colorable claim against the $62,410, it would have been even more unreasonable for O'Callaghan to seek so much for his efforts. The problem here is that O'Callaghan did not actually recover that money for Solis, as required by the fee agreement. Rather, as the bankruptcy court observed, O'Callaghan at best clarified Solis' title to that money through a binding legal judgment.

Under O'Callaghan's broader interpretation of the word, an attorney would "recover" funds or property any time she successfully defends a client against others' claims. That approach stretches the word too far and would make unsophisticated clients vulnerable to unanticipated fee demands whenever counterclaims are asserted against them. We recognize that potential and actual counterclaims can pose serious complications when an attorney represents a claimant under a contingent fee agreement. Attorneys are entitled to protect

both themselves and their clients in such cases. The onus is on the attorney to recognize the risks and to draft fee agreements that clearly indicate the client's fee responsibilities. The later attempt here to stretch the definition of "recover" to include the successful defense of claims against funds already in the client's possession does not meet that test.

O'Callaghan's remaining arguments are also unpersuasive. He argues that he is entitled to a reasonable fee for obtaining a declaration of Solis' rights, but the sources he cites are inapposite because they concerned fee disputes in the absence of enforceable fee agreements. See, *e.g.*, 770 ILCS 5/1 (allowing liens for a reasonable fee absent a fee agreement); *Rhoades v. Norfolk & W. Ry. Co.*, 399 N.E.2d 969, 974-75 (Ill. 1979) (allowing quantum meruit recovery because fee agreement was unenforceable). The fee agreement here specified O'Callaghan's fee regardless of how much or how little work he performed. His dissatisfaction with his bargain is no reason to set it aside.[4] O'Callaghan also argues that he had a valid attorneys' lien. The existence of that lien

---

[4] O'Callaghan has offered no evidence to show what a reasonable fee might have been for his defense against the asserted claims. He has argued this appeal on an all-or-nothing basis, stating that 40 percent of the entire settlement is a reasonable contingent fee for his work. He admits not keeping time records, but see Ill. R. Prof'l Conduct 1.5(a)(1) (making time expended relevant to the reasonableness of a fee), and tells us little about the defendants' claims. Thus, even if we were to reach the reasonableness of his claimed fee on a quantum meruit basis, our judgment would be the same.

is not contested. The issue is the amount of that lien under the terms of the agreement. See 770 ILCS 5/1 ("Attorneys at law shall have a lien . . . for the amount of any fee which may have been agreed upon . . . ."). O'Callaghan was entitled only to 40 percent of the $60,000 cash he recovered, plus expenses, the amount of the claim that the trustee agrees is valid. We agree that that is the correct amount of O'Callaghan's valid lien.

The judgment of the district court, affirming in turn the decision of the bankruptcy court, is AFFIRMED.